UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

A.M.S., *et al.*,
　　Plaintiffs,

vs.

JULIAN T. STEELE, *et al.*,
　　Defendants.

Case No. 1:11-cv-298

Dlott, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff, A.M.S., brings this action on behalf of herself and her two minor children, R.M.

and L.G., under 42 U.S.C. § 1983 alleging violations of their constitutional rights against the

City of Cincinnati, Cincinnati Police Detective Calvin Mathis (Mathis), Cincinnati Police

Captain David Bailey (Bailey), various John Doe Cincinnati Police Officers, and former

Cincinnati Police Detective Julian Steele (Steele). This matter is before the Court on the motion

to dismiss of defendants City of Cincinnati and Bailey (Doc. 12) and plaintiffs' memorandum in

opposition. (Doc. 20). Bailey and the City of Cincinnati move to dismiss the complaint under

Fed. R. Civ. P. 12(b)(6) on the grounds that plaintiffs' complaint fails to state a claim upon

which relief can be granted and, further, that Bailey is entitled to qualified immunity. For the

following reasons, the undersigned recommends that defendants' motion to dismiss be granted in

part and denied in part.

I. 　　**STANDARD OF LAW**

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which

relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss pursuant

to Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and must

draw inferences in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236

(1974).  *See also Erickson v. Pardus,* 551 U.S. 89, 93 (2007); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555-56 (2007).

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).  To avoid dismissal for failure to state a claim for relief, plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).  While the Court must accept all well-pleaded factual allegations as true, it need not "accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555 (quoting *Papasan v. Allain,* 478 U.S. 265, 286 (1986)).  The complaint need not contain "detailed factual allegations," yet must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 555).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557.

Although plaintiffs need not plead specific facts, their statement must "give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson,* 551 U.S. at 93 (citations omitted).  Plaintiffs' factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim. *Twombly,* 550 U.S. at 556.  This inquiry as to plausibility is "a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Iqbal,* 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## II.     FACTUAL ALLEGATIONS

The complaint alleges the following facts: on May 5, 2009, at approximately 9:00 p.m., A.M.S. drove Marcus Miller (Miller) and Anthony Griffin (Griffin) to the Northside neighborhood in Cincinnati, Ohio. (Doc. 3, ¶¶ 12-13). Later that evening, at approximately 12:30 a.m., Miller and Griffin called A.M.S. and asked her to pick them up in Northside at a nearby grocery store and take them home. *Id.,* ¶ 14. A.M.S. agreed to this request and proceeded to pick up Griffin and Miller. *Id.,* ¶¶ 14, 16. Unbeknownst to A.M.S., Griffin and Miller had committed two robberies against individuals while in Northside that night and when she picked them up, a witness observed her license plate number and reported it to the police. *Id.,* ¶¶ 15, 16.

Defendants Steele and Mathis, partners and detectives, were assigned to investigate the May 5, 2009 robberies and were given the information that A.M.S.'s vehicle was used to transport the suspected robbers. *Id.,* ¶¶ 17-19, 28. Mathis was previously acquainted with A.M.S. because he had investigated a domestic violence incident between A.M.S. and her ex-husband 12 years earlier. *Id.,* ¶ 29. During that investigation, when A.M.S. was transported to a hospital, Mathis had watched over her children and over the years they became friendly acquaintances and Mathis knew A.M.S.'s two sons, R.M. and L.G., as well as her daughter. *Id.* Mathis was aware that A.M.S., R.M., and L.G. had no criminal history and also knew that

A.M.S. was susceptible to coercion due to her history with abusive men. *Id.*, ¶ 30. Mathis informed Steele, his partner, of his history with A.M.S., R.M., and L.G. *Id.*, ¶ 31.

Steele had previously established a pattern of abusing his police powers to solicit dates or sexual favors from women he encountered in the course of his official duties. *Id.*, ¶ 26. Steele and Mathis, both married at the time, maintained a furnished apartment on Winton Road which was used by Steele, and possibly Mathis as well, as a location for extramarital sexual encounters. *Id.*, ¶ 27. Upon learning that A.M.S. had two teenage sons, R.M. and L.G., Steele resolved to arrest them as an "investigative technique" to coerce them into providing information against their mother or get them to confess to the robberies themselves, despite having no probable cause to believe they were involved in the crimes; Steele further intended to use his police powers to coerce sexual favors from A.M.S. *Id.*, ¶¶ 32-33.

On May 7, 2009, Steele, Mathis, and three uniformed Cincinnati Police Officers (John Doe defendants 1-3) went to Riverside Academy to arrest R.M., L.G., and Griffin, who were all students there. *Id.*, ¶ 34. Steele and Mathis spoke to the school Superintendent who was surprised to learn that R.M. and L.G. would be involved in criminal activity as he had a long-standing history with these students and had always known them to be well-behaved, but Steele and Mathis insisted and the Superintendent allowed the boys to be taken from class for questioning. *Id.*, ¶¶ 35-36. R.M. and L.G. were taken from their class rooms, handcuffed in view of school staff and students, placed in the back of police vehicles, and driven to the police station for questioning. *Id.*, ¶ 37. Despite the official policy of the Cincinnati Police Department to notify parents when minors are arrested and before they are transported to the Juvenile Detention center, Steele and Mathis purposefully did not contact A.M.S. to report that they had

arrested R.M. and L.G. because, as Steele related, he didn't want to alert A.M.S. because of the possibility that "they'll have lawyers and all that kind of stuff." *Id.*, ¶ 22, 38-39.

Once R.M., L.G., and Griffin were at the police station, Steele and Mathis separately interrogated them. *Id.*, ¶ 41. Steele claimed he was planning to investigate and arrest A.M.S. for driving the suspected robbers, but he intended to extract confessions from R.M. and L.G. to clear the case even though he had no probable cause to believe they were involved in the crimes. *Id.*, ¶ 42. Steele threatened R.M. and L.G. that if they did not confess to the robberies he would arrest and prosecute A.M.S. and that she would spend fifteen years in prison. *Id.*, ¶ 43. L.G. repeatedly and truthfully denied any involvement in the crimes and told Mathis and Steele that he had no knowledge of the robberies; L.G. was released after only a few hours in custody. *Id.*, ¶¶ 44-45.

After L.G. was released, Steele and Mathis put further pressure on R.M. to coerce his confession by repeating threats that his mother would be incarcerated and, further, that his brother and sister, L.G. and L.S., would be taken away to live in separate foster homes. *Id.*, ¶¶ 46-47. R.M. eventually agreed to confess to committing the robberies in order to keep his family together and to keep his siblings out of foster care. *Id.*, ¶¶ 48-49. Steele and Mathis then turned on recording equipment to record the confession, but because R.M. had no specific knowledge or involvement in the May 5 robberies he was unable to provide any pertinent facts or information. *Id.*, ¶¶ 50-51. As a result, the recorded confession was comprised of R.M.'s affirmative responses to Steele's leading questions. *Id.*, ¶ 52. Despite having no evidence against R.M. and knowing that the confession was made under coercion and to protect his family, Steele chose to charge R.M. with six robberies and have him transported to the Juvenile Detention Center where he remained for eight days. *Id.*, ¶¶ 53-54. While Mathis stated to Steele that this course of

action "didn't seem right," he did nothing to intervene and did not report Steele's unlawful conduct. *Id.*, ¶ 55.

Meanwhile, A.M.S. received a call from L.G. and made her way to the police station where she learned from L.G. that he had been falsely accused of robbery and that R.M. was still in custody. *Id.*, ¶ 56-57. At the station, A.M.S. asked repeatedly to speak to Steele, but he refused to talk to her and had a duty officer tell her to leave the station and return the next morning. *Id.*, ¶ 58-59. Steele told Bailey, his direct supervisor, that he didn't want to speak to A.M.S., and was going to "let her stew" overnight. *Id.*, ¶ 59. A.M.S. returned to the station that evening, requesting to talk to someone about what was happening with R.M. *Id.*, ¶ 61. At one point, she spoke with an internal affairs officer, explaining that R.M. was being wrongly held; the officer said he would check into it, but never returned to speak to A.M.S. *Id.*, ¶ 62. A.M.S. stayed in the lobby and waited to speak to Steele, while other officers threatened to arrest her if she did not leave. *Id.*, ¶ 63. At no point did Steele or Mathis attempt to question A.M.S. about her involvement with the May 5 robberies despite having information that she drove the suspected culprits away from the area of the crime. *Id.*, ¶ 64.

A.M.S. returned to the station the next day to speak to Steele, bringing along Miller, who had actually committed the robberies with Griffin, and who provided information to the police that led to his arrest, prosecution, and conviction for the crimes. *Id.*, ¶ 66. Steele told A.M.S. to meet him at his off-duty "detail" assignment at a local grocery store to further discuss R.M.'s case and A.M.S. agreed; Steele was in full Cincinnati Police uniform during the meeting. *Id.*, ¶¶ 67.[1] At the grocery store, Steele told A.M.S. that he believed R.M. was innocent but that they would have to "go through the process;" Steele also complimented A.M.S.'s physical appearance and related that he wanted to hold her hand when they spoke earlier at the police station. *Id.*, ¶¶

---

[1] The complaint contains two paragraphs numbered paragraph 67; this citation refers to both.

68-69. Steele said he "shouldn't be doing this," but invited A.M.S. to his apartment to further discuss R.M.'s case, explaining that he was married but maintained an apartment. *Id.*, ¶ 70-71. Hoping to secure R.M.'s release, A.M.S. agreed to meet Steele. *Id.*, ¶ 72. At the apartment, Steele repeated his belief in R.M.'s innocence and offered to help A.M.S. through the process. *Id.*, ¶¶ 73-74. Steele put increasing pressure on A.M.S. over the next few days to engage in sexual activity with him, alternately threatening her with incarceration for driving Miller and Griffin on May 5, then reassuring her that he would help her get R.M. released, and eventually, under duress and coercion and to secure Steele's help in releasing her son, A.M.S. capitulated and performed fellatio on Steele. *Id.*, ¶¶ 75-76. Steele continued to solicit A.M.S. to meet him at the apartment for further sexual encounters but she declined. *Id.*, ¶ 77.

Steele met with Meghan Shanahan (Shanahan), a Hamilton County Prosecutor, eight days after R.M.'s arrest to prepare for the presentation of R.M.'s case before the grand jury. *Id.*, ¶ 78. Steele told Shanahan that he had no real evidence against R.M., did not believe R.M. was involved in the robberies, and did not believe R.M.'s confession was truthful, but that R.M. had confessed to protect A.M.S. *Id.*, ¶ 79. Steele told Shanahan he had arrested R.M., the innocent minor, as an "investigative technique" to pressure A.M.S., but did not tell Shanahan that he had pressured and coerced A.M.S. into engaging in sexual activities with him. *Id.*, ¶¶ 80-81. Shanahan immediately ordered that R.M. be released and contacted Cincinnati Police Internal Affairs and Senior Prosecutors to report Steele's misconduct. *Id.*, ¶ 82. During the subsequent presentation of R.M.'s case to the grand jury, Shanahan asked Steele leading questions which required him to testify before the grand jury that he had no evidence or probable cause to believe that R.M. was involved with the robberies and that R.M. confessed to protect A.M.S.; Steele later complained to police investigators and to Shanahan's supervisor that her questions prevented

R.M.'s indictment. *Id.*, ¶¶ 83-84. Steele wanted Shanahan to ask open-ended questions so he could "work his mojo" on the grand jury as usual, so that after his "song and dance" the grand jury might have issued an indictment against the innocent R.M. *Id.*, ¶ 85. Steele complained that Shanahan prevented him from doing "what the City pays [him] to do." *Id.*, ¶ 86.

After investigation, Steele was indicted, prosecuted, and convicted of two felony abduction accounts for the false arrests of R.M. and L.G. and one count of intimidation for the use of the confession he coerced from R.M. *Id.*, ¶ 88. Steele was sentenced to five years imprisonment to be followed by five years of community control. *Id.* Steele is currently free on bond pending appeal. *Id.*, ¶ 89. Mathis was never criminally charged but was demoted from detective to police officer. *Id.*, ¶ 90.

With respect to the City of Cincinnati, plaintiffs allege that in response to a gang-related increase in drug and crime activity the City has developed a custom, policy and practice of arresting young black males for little or no reason, or on false or inflated charges, or on no charges at all, in order to empty the streets of suspected or potential criminals. *Id.*, ¶ 21. Further, plaintiffs allege that although the official policy is that parents of minors are to be notified when a minor is arrested and before they are taken to the Juvenile Detention Center, the actual policy, custom and practice among Cincinnati Police is to routinely detain minors without notifying their parents. *Id.*, ¶ 22. This actual practice, which is contrary to the official policy, is used to deny minors access to counsel (a likely result of notifying a parent) and interrogate and extract evidence or confessions. *Id.*, ¶ 23. Further, the City's official policy requires that interviews with suspects be recorded in their entirety, but the actual policy, custom and practice among police detectives is to browbeat, threaten, deceive, and otherwise coerce minors in custody into agreeing to provide confessions off-tape and then record only the false confessions or statements.

*Id.*, ¶ 24. This practice makes it appear that the confessions are voluntary and more credible, when they are not, to obtain more criminal convictions. *Id.*, ¶ 25.

Plaintiffs allege that the conduct and acts of Steele, committed under the color of law, amount to violations of R.M. and L.G.'s Fourth Amendment rights, violations of R.M.'s Sixth Amendment rights, and constitute various tortious and criminal acts against R.M., L.G., and A.M.S. *Id.*, ¶¶ 92-93. Further, plaintiffs allege that Mathis, Bailey, and Doe Defendants 1-3, acting under the color of law, committed or assisted Steele in committing, or knowingly failed to intervene and prevent, the above violations of plaintiffs' constitutional rights as well as Steele's tortious and criminal acts, and that this failure to intervene violated plaintiffs' clearly defined constitutional rights. *Id.*, ¶ 94-95. Plaintiffs also allege that the City of Cincinnati and John Doe Defendants 4-10, policymakers within the Cincinnati Police Department, are liable under a *Monell*[2] theory because they have failed to provide adequate training to Cincinnati police officers and detectives; have established, permitted or condoned the above related policies, practices, and procedures leading to violations of plaintiffs' constitutional rights; and have failed to properly discipline officers like Steele to discourage improper police conduct which resulted in the violation of plaintiffs' constitutional rights. *Id.*, ¶ 96-98.

## III.    ANALYSIS

Defendants Bailey and the City of Cincinnati seek dismissal of plaintiff's complaint on the following grounds: (1) plaintiffs' factual allegations are insufficient to establish a § 1983 claim of supervisory liability on behalf of Bailey; (2) Bailey is entitled to qualified immunity for plaintiffs' § 1983 claims; (3) plaintiffs' complaint fails to state a claim against Bailey for intentional or negligent infliction of emotional distress; (4) Bailey is entitled to state tort

---

[2] *See Monell v. Dept. of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978) (holding that municipalities can be held liable under § 1983 for the unconstitutional acts of its employees resulting from a municipal custom, practice, or policy).

immunity for plaintiffs' claims of intentional and/or negligent infliction of emotional distress; and (5) plaintiffs' complaint fails to state a claim of municipal liability against the City of Cincinnati. The Court will first address defendants' arguments with respect to defendant Bailey.

A. Defendant Bailey

As an initial matter, the Court notes that plaintiffs concede that pursuant to Ohio Rev. Code § 2744.03(A)(6)[3] Bailey is likely immune from their state tort claims and seek to dismiss their state law tort claims against Bailey, without prejudice. *See* Doc. 20, pp. 1-2. The undersigned recommends that plaintiffs' request to voluntarily dismiss the state law tort claims against Bailey without prejudice be granted.

Plaintiffs also state they intend to proceed only with their official capacity claims against defendant Bailey and withdraw their individual capacity claims against him. (Doc. 20, p. 1). However, much of plaintiffs' brief is devoted to argument on plaintiffs' "claim of supervisory liability against Captain Bailey." *Id*, p. 9. It is apparent that plaintiffs have erroneously conflated "supervisory liability" with official capacity liability. Individual capacity claims seek to hold a defendant personally liable for actions taken under color of state law. *Kentucky v. Graham*, 473 U.S. 159 (1985). Official capacity claims, in contrast, are the equivalent of claims brought against the governmental entity itself. *Id*. at 165-66. Establishing "supervisory liability" against defendant Bailey is a way of holding defendant Bailey personally liable in his individual capacity. As it is apparent to the Court that this is in fact plaintiffs' intent in this matter, the Court shall address whether plaintiffs' complaint contains sufficient allegations to state a § 1983 claim against Bailey in his individual capacity as a supervisor of defendants Steele and Mathis.

_____

[3] Ohio Rev. Code § 2744.03(A)(6) provides immunity from civil liability to Ohio state employees for acts or omissions conducted within the scope of their employment, unless such acts or omissions were made in bad faith, with malicious purpose, or were wanton or reckless.

A supervisor cannot be held liable under § 1983 simply by virtue of his position as supervisor over an offending individual. *McQueen v. Beecher Cmty. Schools*, 433 F.3d 460, 470 (6th Cir. 2006) (quoting *Sheehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). Further, "[s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999) (*citing Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989)). Rather, to state a claim for supervisory liability sufficient to withstand a Fed. R. Civ. P. 12(b)(6) challenge, a complaint must allege specific facts demonstrating that the defendant "either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Sheehee*, 199 F.3d at 300.

Defendants argue that plaintiffs' complaint fails to satisfy this standard as it contains no factual allegations that Bailey was directly involved with, or even knew about, Steele's and/or Mathis' alleged unlawful conduct. Plaintiffs' complaint contains the following allegations against Bailey:

- "[D]efendant Bailey was, at the time of the incidents giving rise to this lawsuit, in a position of direct supervisory authority over former Detectives Steele and Mathis, and was aware or should reasonably have been aware of their misconduct in this case, and either condoned or failed to prevent it." (Doc. 3, ¶ 8).

- "Steele told the defendant Capt. Bailey that he didn't want to speak to [R.M. and L.G.]'s mother, and that he was just going to 'let her stew' a bit overnight." *Id.*, ¶ 59.

- "[Defendant] Bailey . . . committed or assisted Steele in committing under color of law, or knowingly failed to intervene and prevent [Steele's unlawful acts]." *Id.*, ¶ 94.

- "[Defendant] Bailey . . . in committing the foregoing acts under color of law, or in failing to intervene and prevent Steele from committing the foregoing acts, violated the plaintiffs' clearly defined constitutional rights . . . ." *Id.*, ¶ 95.

Defendants contend that these allegations are insufficient to state a claim for supervisory liability against Bailey as they fail to establish that Bailey was directly involved with the violation of plaintiffs' rights or even had knowledge that Steele and Mathis were engaging in unconstitutional conduct.  Plaintiffs respond that Bailey was in a position of direct supervisory authority over Steele and Mathis during the events giving rise to this lawsuit and, as such, was likely aware of the unconstitutional conduct allegedly committed by Steele and Mathis and, if not, was deliberately indifferent to it.  Further, plaintiffs contend that Bailey is most likely one of the John Doe 4-10 defendants responsible for the alleged policies, customs, and/or practices which resulted in the violation of plaintiffs' unconstitutional rights.

The factual allegations pertaining to Bailey in plaintiff's complaint are sparse: Bailey was a Captain in the Cincinnati Police Department with direct supervisory authority over Steele and Mathis on the date R.M. was being held at the police station and "Steele told Bailey that [Steele] didn't want to speak to [A.M.S.] and that he was going to 'let her stew' a bit overnight." (Doc. 3, ¶¶ 8, 59).  Viewing these limited allegations in the light most favorable to plaintiffs, the Court cannot draw a reasonable inference that Bailey encouraged, directly participated in, or even had knowledge of the unconstitutional conduct allegedly committed by Steele and/or Mathis.  At most, plaintiffs have alleged that Bailey knew Steele did not want to speak to the mother of a juvenile in police custody.  Regardless of Steele's motives for avoiding the conversation, this conduct, in and of itself, is not unconstitutional.  Accordingly, Bailey's alleged knowledge that Steele did not want to talk to A.M.S. is insufficient to state a claim against Bailey for supervisory liability.

With respect to plaintiffs' allegations that Bailey "committed or assisted Steele in committing under color of law, or knowingly failed to intervene and prevent [Steele's unlawful

acts]" and "in committing the foregoing acts under color of law, or in failing to intervene and prevent Steele from committing the foregoing acts, violated the plaintiffs' clearly defined constitutional rights[,]" Doc. 3, ¶¶ 94-95, the complaint contains no factual matter relating to these allegations and the Court "need not 'accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan*, 478 U.S. at 286). Similarly, plaintiffs' argument that "[i]t is highly unlikely that Captain Bailey would have been unaware" of Steele's unconstitutional conduct with respect to arresting and interrogating R.M. is unavailing because: (1) there are no allegations in the complaint that Bailey was "likely" aware of the alleged wrongful conduct; and (2) even if there were, such allegations are precisely the sort of pure speculation disallowed by *Twombly* and *Iqbal*. Lastly, to the extent plaintiffs contend that Bailey "is most likely" one of the unnamed Doe defendants who are policy makers for the City this argument is not only speculative but, further, conflates supervisory liability with municipal liability. Plaintiffs' complaint contains no allegations that Bailey was a policy maker responsible for creating or implementing the policies, practices, or procedures giving rise to the alleged constitutional violations. Even under the Fed. R. Civ. P. 8 notice-pleading standard, plaintiffs' allegations are insufficient to put Bailey on notice that plaintiffs seek to hold him personally liable.

For these reasons, the undersigned recommends that defendants' motion to dismiss plaintiffs' claims against defendant Bailey be granted.

B. <u>Defendant City of Cincinnati and Defendant Bailey in his Official Capacity</u>

Defendants further move to dismiss plaintiffs' claims against the City of Cincinnati and Defendant Bailey arguing that the complaint fails to state a claim establishing municipal liability or liability on behalf of Bailey in his official capacity. In response, plaintiffs do not present any

argument in support of their official liability claim against Bailey but, rather, as discussed above, mistakenly conflate their argument in support of Bailey's supervisory liability with official capacity liability.  For the following reasons, the undersigned recommends that defendants' motion to dismiss plaintiffs' claims against Defendant Bailey in his official capacity be granted but that their motion to dismiss plaintiffs' municipal liability claims against the City of Cincinnati be denied.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  A municipality is considered a "person" for § 1983 purposes, *Monell*, 436 U.S. at 690, and may be held liable where there is a direct causal link between the constitutional violation and a municipal custom, policy or practice.  *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122-24 (1992).  Thus, the municipality is not simply being held liable under a *respondeat superior* theory; rather, liability is premised on the municipality's direct conduct in implementing a custom, practice, or policy which has caused a plaintiff's constitutional injury. *Bd. of County Commrs. of Bryan County, Okl. v. Brown*, 520 U.S. 397 (1997); *Polk County v. Dodson*, 454 U.S. 312 (1981).  A plaintiff may demonstrate the existence of an unconstitutional policy or custom by looking to: "(1) The municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 431 (6th Cir. 2005).

"A claim against a municipal officer in his official capacity is no different from a claim against the municipality itself." *Lee v. Metro. Govt. of Nashville and Davidson County*, No. 3:06-0108, 2008 WL 501327, at *6 (M.D. Tenn. Feb. 21, 2008) (quoting *Graham*, 473 U.S. at 165 (Official-capacity suits "generally represent only another way of pleading an action against the entity of which an officer is an agent.")). "[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official." *Hafer v. Melo*, 502 U.S. 21, 25 (1991). As plaintiffs have named the City of Cincinnati as a defendant for their § 1983 claims, the inclusion of defendant Bailey in his official capacity is redundant and unnecessary. Accordingly, the undersigned recommends that plaintiffs' claims against defendant Bailey in his official capacity be dismissed.

Regarding the City of Cincinnati, plaintiffs allege that the City, by and through its policy-makers (John Doe Defendants 4-10), is liable for plaintiffs' constitutional injuries for the failure to provide adequate training to police officers and detectives and for establishing, permitting or condoning policies, practices or procedures of: "arrest first, investigate later" and "the ends justify the means" in policing high-crime neighborhoods such as Northside; coercing confessions "off-tape" and selectively recording portions of confessions to enhance their credibility and increase conviction rates; not notifying guardians of minors that are held for questioning to avoid the possibility of counsel being obtained for the minors; allowing police officers and detectives to present skewed information and evidence to grand juries to increase indictment rates; and allowing rogue officers like Steele to operate without intervention, thus failing to prevent known or obvious police misconduct. (Doc. 3, ¶¶ 96-99). Plaintiffs further allege that these policies, practices, and procedures resulted in the violations of plaintiffs' clearly established constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. *Id.*, ¶ 97. Notably, these

-15-

allegations are in addition to the extensive factual allegations, recited *supra*, pertaining to specific acts of defendants Steele and Mathis.[4]

Plaintiffs have alleged sufficient facts at this juncture showing that the City of Cincinnati's practices and policies are insufficient to protect the rights of minor suspects and have caused the deprivation of plaintiffs' constitutional rights. Accepting plaintiffs' allegations as true and drawing all inferences in a light most favorable to plaintiffs, the undersigned finds that plaintiffs have sufficiently pled a § 1983 *Monell* claim against the City of Cincinnati. Accordingly, defendants' motion to dismiss plaintiffs' § 1983 claim against the City of Cincinnati should be denied.

## V. CONCLUSION

For the above reasons, the Court hereby **RECOMMENDS** that:

(1) Plaintiffs' request to voluntarily dismiss the state law tort claims against Bailey without prejudice be **GRANTED**;

(2) Defendants' motion to dismiss (Doc. 12) be **GRANTED** in part and **DENIED** in part.

   a.  Defendants' motion to dismiss plaintiffs' claims against defendant Captain Bailey be **GRANTED**; and

   b.  Defendants' motion to dismiss plaintiffs' claims against defendant City of Cincinnati be **DENIED**.

Date: 6/8/12

Karen L. Litkovitz
United States Magistrate Judge

---

[4] In support of their contention that plaintiffs' claim against the City of Cincinnati should be dismissed, defendants cite to *Summerland v. County of Livingston*, 240 F. App'x 70, 79-80 (6th Cir. 2007) for the proposition that plaintiffs must demonstrate specific facts with respect to the allegedly injurious policy or practice – specifically, the City's alleged failure to train its police officers. However, *Summerland* involved a motion for summary judgment rather than a motion to dismiss for failure to state a claim for relief. *Id.* at 71. The standard for a summary judgment motion differs greatly from that for a motion to dismiss; consequently, the undersigned finds the *Summerland* language is in applicable to the motion currently before the Court.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

A.M.S., *et al.*,                                                 Case No. 1:11-cv-298
      Plaintiffs,

                                             Dlott, J.
      vs.                                                 Litkovitz, M.J.

JULIAN T. STEELE, *et al.*,
      Defendants.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).

-17-